UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **MICROSOFT CORPORATION**,<br><br>                            Plaintiff,<br><br>         v.<br><br>**A&S ELECTRONICS, INC.,** *ET AL.*,<br><br>                            Defendants. | Case No.  15-cv-03570-YGR<br><br>**ORDER DENYING CROSS-MOTIONS FOR SUMMARY JUDGMENT; SETTING FURTHER CASE MANAGEMENT CONFERENCE**<br><br>Dkt. No. 72, 82 |

Plaintiff Microsoft Corporation brings this action against defendants A&S Electronics, Inc. and Alan Z. Lin (collectively, "A&S") alleging contributory copyright infringement, as well as claims for trademark infringement, false designation of origin, and unfair competition, and common law counts for constructive trust and an accounting.  (Third Amended Complaint ["TAC"], Dkt. No. 45.)  A&S previously brought a motion to dismiss the TAC.  The Court denied that motion and instead directed the parties to file cross-motions for summary judgment, focused on the issue of whether the licensing agreements alleged in the TAC established that the software sold by A&S was not subject to a "first sale" defense to the copyright infringement claim.  (Dkt. No. 54.)  After a brief period of focused discovery, the parties' filed their motions for summary judgment on the first sale issue (Dkt. Nos. 72, 82) and oppositions thereto.  The Court heard oral argument on February 7, 2017.

1  The Court having considered the briefing, arguments, and admissible evidence[1] in support
2  and opposition, and for the reasons stated herein, **DENIES** the Cross-Motions for Summary
3  Judgment on the first sale issue.  First, triable issues of material fact exist that preclude summary
4  judgment in favor of either party with respect to the sale of the software originally sold through
5  the Home Use Program ("HUP").  Second, the parties have agreed that, because Microsoft product
6  keys are not copyrightable works, and therefore the sale of cards containing the product keys
7  would not be a sale of a copyrighted work, the first sale doctrine does not apply to the alleged sale
8  of such product keys (as traced back to a Chinese student use program) located on "product key
9  cards."

**I.   LEGAL FRAMEWORK**

The federal Copyright Act protects "original works of authorship," including software programs.  17 U.S.C. §§ 101-103.  The Copyright Act confers certain exclusive rights on copyright owners, including exclusive rights to reproduce the works and to distribute the works by sale or rental, and actions in violation of those rights constitute infringement.  *Id.* § 106(1), (3).  The Copyright Act contains limitations on those rights.  Under section 109 of the Copyright Act, the exclusive distribution right is limited by the "first sale" doctrine, which allows owners of particular copies of copyrighted works to resell those copies.  17 U.S.C. § 109(a).[2]  As the Supreme Court has held, "once the copyright owner places a copyrighted item in the stream of commerce . . . . he has exhausted his exclusive statutory right to control its distribution."  *Quality King Distributors, Inc. v. L'anza Research Int'l, Inc.*, 523 U.S. 135, 137 (1998); *see also UMG*

---

[1] For the reasons stated more fully on the record, the parties' Motions to Seal (Dkt. Nos. 76, 80, 96, 107) are **DENIED** for failure to establish compelling reasons to seal the documents in connection with this dispositive motion.  As stated on the record, Microsoft's Request for Judicial Notice (Dkt. No. 93) is **DENIED**.

[2] Section 109(a) of the Copyright Act provide, in part:
Notwithstanding the provisions of section 106(3), the owner of a particular copy . . . lawfully made under this title, or any person authorized by such owner, is entitled, without the authority of the copyright owner, to sell or otherwise dispose of the possession of that copy. . . .
17 U.S.C. § 109(a).

1  *Recordings, Inc. v. Augusto*, 628 F.3d 1175, 1179 (9th Cir. 2011).

2  In the context of computer software, the exclusive reproduction right is limited by the "essential step" defense, which allows the owner of a copyrighted software program to make a copy of the computer program as an "essential step" in the utilization of the program, generally when installing (a copy of) the program onto the computer's hard-drive memory. 17 U.S.C. § 117(a)(1).[3] However, these limitations only apply when the particular copies of the copyrighted works at issue are *owned* rather than merely licensed for use. *Vernor v. Autodesk, Inc.*, 621 F.3d 1102, 1107 (9th Cir. 2010). A true licensee cannot resell the software under the "first sale" doctrine or assert the "essential step" defense against a claim of unlawful reproduction. *Id.*

Here, Microsoft alleges that A&S is liable for contributory infringement which requires Microsoft to establish: (1) direct infringement by a third party (violation of some copyright-protected right) and (2) defendant's knowledge of the direct infringing activity and intentional inducement or encouragement of such activity. *See MDY Indus., LLC v. Blizzard Entm't, Inc.*, 629 F.3d 928, 937 (9th Cir. 2010); *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1013 (9th Cir. 2001). Microsoft asserts that the first sale doctrine does not apply to its software, and particularly to the software at issue in this litigation, because it was not sold to a first purchaser and then resold, but instead was merely licensed.

The Court reviews a trilogy of cases which construct the relevant legal framework. To determine whether a software user is a licensee or an owner, the Ninth Circuit looks to whether the copyright owner: (1) "specifies that the user is granted a license"; (2) "significantly restricts the user's ability to transfer the software;" and (3) "imposes notable use restrictions." *Vernor*, 621

---

[3] Section 117 of the Copyright Act provides, in part:
(a) Making of additional copy or adaptation by owner of copy.-- Notwithstanding the provisions of section 106, it is not an infringement for the owner of a copy of a computer program to make or authorize the making of another copy or adaptation of that computer program provided:
(1) that such a new copy or adaptation is created as an essential step in the utilization of the computer program in conjunction with a machine and that it is used in no other manner….
17 U.S.C. § 117(a)(1).

F.3d at 1111; *see also UMG Recordings*, 628 F.3d at 1180. In *Vernor*, the Ninth Circuit held that software manufacturer Autodesk had: (1) "retained title to the software;" (2) "imposed significant transfer restrictions" including provisions that the license was non-transferable and the software itself could not be transferred or leased without written consent; and (3) imposed "restrictions against the use of the software outside the Western Hemisphere," among others. *Vernor*, 621 F.3d at 1111–12. Based on these and other restrictions, the court concluded "Vernor did not receive title to the copies from [initial purchaser] CTA and accordingly could not pass ownership on to others," so that both CTA's and Vernor's sales infringed on Autodesk's distribution rights. *Id.* at 1112.

The following year, in *UMG Recordings*, the Ninth Circuit further held that merely labeling an arrangement as a license, or stating that the copyrighted works were "not for resale," was not dispositive of the issue. *UMG Recordings*, 628 F.3d at 1180. The Ninth Circuit instead analyzed the transfer itself, including whether the copyright holder retained "sufficient incidents of ownership," such as: (1) recipients expressing agreement to enter into a license; and (2) the copyright holder exercising any "meaningful control or even knowledge of the status" of the copyrighted work after distribution. *Id.* at 1182-83 ("UMG dispatched the CDs in a manner that permitted their receipt and retention by the recipients without the recipients accepting the terms of the promotional statements . . . . [and thereby] effected a gift or sale within the meaning of the first sale doctrine").

Finally, in *Christenson*, the Ninth Circuit clarified the parties' burdens on the issue of establishing a license versus a sale. *Adobe Sys. Inc. v. Christenson*, 809 F.3d 1071, 1078-79 (9th Cir. 2015). The *Christenson* court held that "the party asserting a first sale defense must come forward with evidence sufficient for a jury to find lawful acquisition of title, through purchase or otherwise, to genuine copies of the copyrighted software." *Id.* at 1079. Once established, "[t]o the extent that the copyright holder claims that the alleged infringer could not acquire title or ownership because the software was never sold, only licensed, the burden shifts back to the copyright holder to establish such a license or the absence of a sale." *Id.* The copyright holder must then offer evidence of the "specific license agreements…[that the court could] benchmark [ ]

4

against the *Vernor* factors to determine whether there was a legitimate license at the outset, as well as whether downstream customers were 'bound by a restrictive license agreement' such that they are 'not entitled to the first sale doctrine.'" *Id.* at 1080 (citing *Vernor,* 621 F.3d at 1113).

In *Christenson*, the software reseller offered his own sworn statement as well as an invoice to show that he had "lawfully purchased genuine copies of Adobe software from third-party suppliers before reselling those copies." The court found such evidence "discharged [the reseller's] burden with respect to the first sale defense." *Id*. When the burden then shifted to Adobe, the court held that "Adobe's effort to substitute general testimony and generic licensing templates in lieu of the actual licensing agreements does not withstand scrutiny under *Vernor*" which required consideration of the precise terms of the applicable agreements, not merely whether the agreement was titled a licensing agreement. *Id.*

## II.  ANALYSIS

Here, with respect to the HUP software, A&S has offered a sworn statement, an invoice, a transmittal email, and a cashier's check for payment as proof that it purchased genuine Microsoft software from Flashback Technology ("FTB"). Microsoft has countered with evidence suggesting that: (1) the invoice did not appear to be genuine, according to FTB's person most knowledgeable; and (2) the first, upstream purchaser of the software, Jon Cossin, acquired it unlawfully, such that no subsequent sales could be lawful.[4] Thus, the record establishes disputed issues of material fact as to whether A&S lawfully purchased genuine copies of the Microsoft software it sold.[5]

---

[4] Microsoft's 30(b)(6) designee, however, testified that, "[w]e don't know for certain that Mr. Cossin sold or provided that product and that product key to A and S." (Hansen Decl., Exh. 1, at 36:4-5.)

[5] Microsoft contends that a first sale defense can never be raised by a party who bought a copy that was stolen or unlawfully acquired. However, Microsoft's cited authorities only concern copies for which no payment was made or that were unauthorized. *See Technomarine SA v. Jacob Time, Inc.*, 905 F. Supp. 2d 482, 496 (S.D.N.Y. 2012); *United States v. Drum*, 733 F.2d 1503, 1507 (11th Cir. 1984) (citing *United States v. Moore*, 604 F.2d 1228, 1232 (9th Cir. 1979)) *abrogated on other grounds in Dowling v U.S.*, 473 U.S. 207 (1985); *see also* 2 Melville VB. Nimmer & David Nimmer, NIMMER ON COPYRIGHT § 8.12[B][5] (first sale inapplicable "when the [first] seller is one who has stolen or otherwise wrongfully obtained the copies," citing to cases concerning stolen or pirated copies). Here, the evidence indicates that, if Cossin is considered the *(cont'd...)*

The Court next looks to Microsoft's showing on its burden to establish the *Vernor/UMG Recordings* factors that would demonstrate a license rather than a sale. The evidence tracing the sale of the copy of the software at issue here indicates the following: one, Microsoft engaged Digital River to serve as its "fulfillment agent," and manage purchases of software to Amazon employees through a HUP program. Two, Amazon employee Jon Cossin acquired the software from Digital River under the HUP program. Three, Cossin sold the software to FBT. Four, A&S purchased the software from FBT.

Despite having been advised by the Court that the tracing was a critical component of the analysis in connection with earlier motion practice, Microsoft did not produce evidence of the nature of its agreement with Digital River, the first step in the chain, until its reply brief. That agreement includes a term stating that Digital River never acquired title, but only acted as a "fulfillment agent" such that "title to Products, Upgrades and Third-Party Products shall pass directly from Microsoft to the Customer or Authorized Party and at no time will [Digital River] be deemed to have or take title to any Product(s), Upgrades or Third-Party Products sold by Microsoft pursuant to this [agreement]." (Microsoft Reply Declaration of Melissa Donati, Dkt. No. 107-7, Exh. 1 at 11.)

A&S objected to this late evidence, contending that it should have been identified in connection with Microsoft's response to A&S's Interrogatory No. 2 (*see* Hansen Decl., Dkt. No. 73, Exh. 2 [Microsoft's Objections and Responses to Defendant A&S Electronics, Inc.'s First Set of Interrogatories, dated June 20, 2016]), the deposition notice of its 30(b)(6) designee, and its

---

*(…cont'd)*
original purchaser, he paid for the software at a discounted price and acquired more copies than permitted under the HUP program terms. The question of how to characterize this acquisition remains in dispute, factually and legally. *See id.* at §8.12 [A], [B][1][d].

The evidence Microsoft submitted regarding Cossin's prior conduct as an eBay employee cannot be admitted for the intended purpose. As indicated on the record, the Court will not take judicial notice of the documents regarding prior conduct of Cossin, offered by Microsoft on this point. In addition, Microsoft fails to address the A&S's authorities and argument that it was an innocent purchaser for value, and that its sales transaction was merely voidable rather than void.

1  Rule 26 disclosures.[6] Microsoft now contends the agreement was never requested in discovery. A
2  review of the discovery requests demonstrates otherwise. The Court agrees that the evidence
3  properly should be disregarded in connection with this motion for Microsoft's failure to produce it
4  timely.

5  Notwithstanding the foregoing, even if the Court were to consider the Digital River
6  agreement's provision that title did not pass when the software was transferred to Digital River,
7  triable issues of fact remain with respect to the nature of the first relevant transaction. Prior to the
8  filing of A&S's motion, Microsoft's Rule 30(b)(6) designee, Brittany Carmichael, testified on this
9  topic. Carmichael stated that, to her knowledge, the only notice to a purchaser that the transaction
10 was the purchase of a license would have been found in either the End User License Agreement
11 ("EULA") or the volume licensing agreement between Amazon and Microsoft for the HUP
12 program. (Hansen Decl., Exh. 1 [Depo. of Carmichael] at 31:22-32:17.) With respect to the
13 EULA, the record indicates that a purchaser who did not activate the software would not have seen
14 the terms of the EULA. (*Cf.* Microsoft Cross-Motion Brief [Dkt. No. 80-4] at 7:15-16 ["When
15 they subsequently activate the software, they must agree to Microsoft's End User License
16 Agreement"]). Likewise, Microsoft has presented no evidence to suggest that a purchaser would
17 have seen, much less be bound by, the Amazon volume licensing agreement. Thus, neither the
18 EULA nor the volume licensing agreement indicates that the purchasers had notice of and
19 "expressed agreement to enter into" a license. *Cf. UMG Recordings,* 628 F.3d at 1182-83.

20 Carmichael also testified that she was unaware of whether Microsoft took any steps to
21 track and control the use of the software sold in the HUP program, or to ensure compliance with
22 the terms of the volume license agreement. (Hansen Decl., Exh. 1 at 44:24-45:12.) Microsoft's
23 own testimony thus cuts against a determination that it exercised any "meaningful control or even
24 knowledge of the status" of the copyrighted work after distribution. *Cf. UMG Recordings,* 628

---

[6] A&S also objects based upon lack of foundation of the declarant and that the agreements are not otherwise authenticated or relevant to the time period at issue. These objections are **OVERRULED**.

1   F.3d at 1182-83.

2       That Microsoft offered evidence contradicting the testimony of its corporate designee only
3   underscores the disputed issues of material fact on the *Vernor/UMG Recordings* factors.  In its
4   cross-motion, Microsoft argued that the classification of the transaction as a "license" is
5   established by: (*i*) the Microsoft Home Use Program Terms & Conditions ("HUP Terms &
6   Conditions"); (*ii*) Digital River Terms & Conditions; and (*iii*) the EULA.  Microsoft also
7   submitted evidence from Digital River's Director of Operations and Microsoft Client Delivery,
8   Michael Conner, that HUP software purchasers were required to accept certain terms and
9   conditions before completing their purchase transaction through the Digital River website.  These
10  included the Digital River Terms and Conditions; the Microsoft Terms of Use; the HUP Terms &
11  Conditions; and other conditions, notices and consents that are provided or obtained in connection
12  with the Digital River website.  (Conner Decl., Dkt. No. 84, at ¶ 7 and Exh. 1 at 9.)  Notably,
13  Conner does not indicate that the terms of the EULA itself were part of the disclosures during the
14  purchasing process.  (*Id.* ¶¶ 7-8, Exhs. 1, 2.)

15      A review of the evidence reveals that the Digital River Terms & Conditions merely
16  provided the software could not be "copied, adapted, translated, made available, distributed,
17  varied, modified, disassembled, decompiled, reverse engineered or combined with any other
18  software, save to the extent that (i) this is permitted in the License Terms."  (Conner Decl., Exh.
19  2.)  The terms and conditions did not specifically address whether the purchase was of a license or
20  title to a copy, but instead incorporated the "License Terms."  (*Id.*)  As noted above, Microsoft has
21  indicated that a purchaser who did not activate the software would not have seen the terms of the
22  EULA or "License Terms."  Similarly, the HUP Terms & Conditions only incorporated the license
23  terms of the EULA by reference.  (*Cf.* Conner Decl., Exh. 2, Microsoft Office Home Use Program
24  Terms and Conditions, at § 2 ["ALL ORDERS ARE SUBJECT TO YOUR CONSENT TO ANY
25  APPLICABLE LICENSE THAT IS DELIVERED WITH OR INCLUDED IN THE ITEM.  If you
26  do not agree to the license terms *once you see them*, do not accept them or download the

8

software."] (emphasis supplied).)[7]

In short, based upon the record presently before the Court, numerous factors create triable issues of material fact that cannot be resolved on summary judgment. Accordingly, Microsoft has failed to meet its burden, as set forth in *Christensen*, to establish a license under the factors set forth in *Vernor/UMG Recordings*.

### III. CONCLUSION

The cross-motions for summary judgment are **DENIED**. The Court **SETS** this matter for a case management conference on **April 17, 2017**, at 2:00 p.m. to reset trial and discovery deadlines.

**IT IS SO ORDERED.**

This terminates Docket Nos. 72, 76, 80, 82, 96, and 107.

Dated: March 14, 2017

_____
**YVONNE GONZALEZ ROGERS**
**UNITED STATES DISTRICT COURT JUDGE**

---

[7] Further, even if the purchaser was aware of the terms of the EULA, the terms therein suggest the end user has the authorization under that agreement to transfer, reassign, or resell the software, under certain circumstances. (*See, e.g.,* Kallock Decl., Exh. 4, 2010 EULA, at § 7 [prohibiting copying, publishing, rental, lease, lending of software, but not sale]; § 10 [prohibiting sale of software only when marked as "Not for Resale"]; § 20 [permitting "first user" to make a "one-time transfer of the software and this agreement" to a third party, subject to conditions of removing or not retaining copies], and analogous provisions in Exh. 3, 2013 EULA.)